Next case on the docket is Huels v. Timmermann, case number 514-0422. Mr. Hudspeth. Good morning, your honor. You may proceed. Thank you. Good morning, your honors, and may it please the court. My name is Timothy Hudspeth, and I represent the plaintiffs of Pellis, Alvin, and Mary Hills. This is an appeal from the judgment of the Circuit Court of Clinton County pursuant to the Illinois Supreme Court Rule 301. Further, the order contains the language of the Illinois Supreme Court Rule 303, allowing for an appeal even if there remain other issues, which we do not believe there are. Plaintiffs respectfully request this court find the trial court's July 30, 2014, order to be against the manifest weight of the evidence, as it found plaintiffs' use of the roadway across defendant's properties to have been permissive rather than adverse. To briefly summarize the trial court proceedings, plaintiffs initiated this litigation to establish a prescriptive easement across various parcels of land owned by the defendants. Following a bench trial and submission of written closing arguments, the trial court entered an order dated July 30, 2014, which begins at page 131 of the record. That order found that the only issue of a fact or law which exists between the parties is the question of whether plaintiffs' use of the roadway was adverse. Ultimately, the trial court found the use to be permissive, and this appeal was filed. The primary issue on appeal is whether the trial court's finding that plaintiffs' use of the roadway across the defendant's properties was permissive is against the manifest weight of the evidence. A secondary but related issue is whether the trial court's finding that Mr. Hill's testimony contradicted an answer to an interrogatory was in the use of discretion. As a brief factual background, the roadway that is in dispute travels across private property, begins at a public railway in Clinton County, winds across properties, and ends at land that is owned by the plaintiffs today. The road has been used by the plaintiffs or their predecessors for quite some time. The record reflects that it may actually have been back as early as 1965. The trial court's finding of permissive use is against the manifest weight of the evidence because there was no evidence of plaintiffs ever receiving permission to use the roadway. Further, the finding is arbitrary because it's partially based on the demeanor of one of the defendant party witnesses. In this case, there was no conclusive evidence on the origin of the roadway. Because there was no conclusive evidence on the origin of the roadway, there's a rebuttable presumption of a grant or adverse right because the roadway, according to the trial court, was used openly, uninterruptedly, continuously, and exclusively for more than 20 years. That point of law is discussed in multiple cases, one of them being the Peterson case. Courts conclude in that situation that the use has grown out of a grant from the landowner unless the landowner is able to show that there's some form of permission granted to the easement claimant. Prior case, the Rush case, Rush v. Collins, stated that absent evidence of a license or other revocable right, courts would presume a grant by the landowner because that does not presume that the easement claimant trespassed upon another's property. The court was on to say the landowner has no reason to permit such a long use unless he believes the claimant had an undefeatable right to use it. Public policy and convenience require this presumption of a grant or adverse right because it promotes peace. That case, the Rush case, was, I think, from 1937. It was recently, hasn't been cited over the years, but in a recent case, Nationwide Financial LP v. Poboda, Illinois Supreme Court, basically said we agree with the Rush reasoning and that it is still good law on the point. In the Nationwide case, the court ultimately found that there was a prescriptive easement. In coming to that conclusion, the Illinois Supreme Court relied heavily on the fact that there was an unknown origin of the way. Beginning of the roadway, when the roadway came to exist, had not been shown. That same is true in our case. There's been no conclusive proof. There's been speculation at best as to the origin of the roadway. Further, the easement claimants in this case, my clients, the plaintiffs, never asked for permission to use the roadway. It was there. It had been there, according to the witnesses, for basically as long as anyone could remember. The trial court found that it was there, I believe, back to 1965. My clients simply used the roadway. The finding of the permissive use was not based upon the evidence, and the use was adverse. Again, Mr. Hills testified to never seeking permission to use the roadway. Other than possible presumptions, I don't believe that the record shows that that was ever contradicted. As to the presumptions, certain of those are imputed upon my clients because of their predecessor. Alton Hills farms the property today. His father, Paul Hills, farmed it before him. Is this essentially a farm road for access for farming? Correct, Your Honor. It is. Is there a gate on the road? I'm sorry? Is there a gate on the road? At one time or another, there was a cable. There was a gate not during the entirety of the road or the entirety of my clients' use. Aside from the fact that there was never permission asked, I don't think that there's any way to get around the origin of the road not being shown. Getting back to the Nationwide case that actually talked about certain inferences, certain presumptions arising, and it kind of read us a battle of presumptions. The ultimate presumption that won was when the origin of the roadway is not shown and all the other elements for prescriptive easement are shown to be present, that the use will be presumed to be either from a grant of right or presumes to be adverse. Further, the trial court's finding, in part, was arbitrary. None of the party witnesses, and this is referenced in the trial court's order, the July 30th order, the trial court made a finding as to the demeanor. The trial court did not assign any credibility to testimony based on that demeanor. The trial court would appear to have said because of how this witness presents, it wouldn't be in his character to allow someone to use his property unless he had given them permission. Trial courts are certainly entitled to form an opinion about a witness and about their demeanor and about their credibility, and that's not part of our dispute. Well, I'm looking at the order assigned by the judge. It appears that he does assign credibility to the testimony of Danny Pottas. Is that how you say it? That's close, Judge, yes. So isn't it fair to say that he did assign credibility findings in his order? He did assign credibility to Mr. Pottas' testimony, Judge. The specific part that I'm referring to has to do with Defendant James Tiller, where I believe the wording is obstreperous, outspoken, combative individual. Specifically related to that, I don't believe that there is credibility determination. It just appears more as he doesn't seem the type that would let someone use his property unless they have permission. If we take that same opinion. Well, that's right after the court comments that Timmerman denied that there was a conversation in 1967, right? Yes, yes, I believe he did. So the court is making that observation in conjunction with the contradictory testimony between your client and Mr. Timmerman. The court does make that finding, Judge. But those appear to be on somewhat different elements. But on the one hand, the court is saying, okay, we apparently believe that maybe the conversation did not take place. But then the next paragraph, it just seems to say he doesn't seem like the type of person who would let someone use his property without permission. And I don't know that that reflects back to or that relates directly to the credibility from the prior paragraph as the court referenced. If we look at the same opinion that the trial court may have formed on this witness, I think we could just as easily follow the reasoning in the Lodgard holding from the Rush case to say the plaintiff's use was adverse. Again, because the defendant is not the type of person who would let someone use his property unless he believed they had a right to do so. And that other assumption or that opposite does not involve the credibility of a witness, as the court asked. In reading and in looking at the cases that are cited in the brief, your honors, I think the Rush and the Nationwide case are the most similar to the present case. There's no origin, there's no conclusive evidence on the origin of the road. And I believe it's the Nationwide case that actually says we can speculate as to the origin of the road, but that was not often submitted into evidence. It just can't be proven. Again, the record here shows that the road was just there for quite some time. No one really knew when it began or who first used it. It was just there and was used. And I don't know that we can get past that presumption then of an adverse use. Because the origin of the railway has not been shown, we have the presumption of a grant or an adverse right. The trial court's finding of permissive use is not based upon the evidence or the lack of evidence of the origin of the railway. And to the extent that it's based upon the demeanor of a witness without or unrelated to the credibility the court assigns to a witness, the court's decision is arbitrary. The plaintiffs would respectfully request this court reverse the trial court and find plaintiff's use of the road to have been adverse. On the second issue, which has to do with the contradiction based upon the answer to interrogatory, the trial court's finding that Mr. Hills' testimony contradicted an answer to an interrogatory is an abuse of discretion. Whether the parties properly answered an interrogatory is a question left to the trial court's discretion and shouldn't be overturned unless it's improperly exercised. The appellant meets his burden of showing an abuse of discretion when the record contains no support for that exercise of discretion. Up until the record was supplemented on appeal, the answer to the interrogatory was not contained in the record. Okay, let me ask you a question. The way I understand that this happened, is it pronounced Hules? I believe it's Hills. Mr. Hills is on the witness stand. He's purportedly impeached with an answer to interrogatory. Correct. You're sitting there. You had the opportunity, don't you, to read the rest of the interrogatory into the record for the trial court? On the redirect, yes. You did not. That's correct. So how can you claim an issue on appeal when you waived or forfeited your opportunity to do that? I wouldn't say that it was waived or forfeited. I would say that the benefits of hindsight, it certainly could have been brought up. Well, I mean, that's the law. That's the rules of evidence. That's the rules of discovery. You have an opportunity to point out that there's more to this answer to interrogatory than the other side asked during the questioning. So, you know, if the trial court's sitting there and doesn't have the full answer to the interrogatory, the witness is impeached, okay? Nothing else happened. How is it an abuse of discretion for the trial court to consider that to be impeachment? I think that it was a – I think in order to make a full determination of whether it was an impeachment, the trial court has to sua sponte do something. Anytime somebody's impeached on interrogatory, the trial court's supposed to say, well, now, wait a minute here. I haven't seen the interrogatory. There may be more to that. That's not the way the rules of evidence work. That's not the way the rules of evidence are written, Your Honor. Correct. We would submit, however, that because it was followed previously on other witnesses that the same procedure that the answer should have been read onto the record, the trial court should have been made fully aware of what it was, of what the answer was, and make a determination at that point as to the contradiction. Did you make an objection at the time of improper impeachment or anything like that? No, Your Honor. No objection to that. Okay. Wasn't the trial judge's finding here just a credibility finding based upon the impeachment? I believe it was at that point, Judge. I basically believe that I basically found that part of the testimony to be not correct. And just to make another point, I mean, even if the whole answer to the interrogatory was read, there's no specific reference to a 1967 discussion. There's no direct reference to the year on that. In fact, it says it was all leading up to the filing of the lawsuit. Correct. The substance was disclosed. And the substance of the interrogatory or the substance of the answer would be more what puts the opposing party on notice of what to expect, as opposed to exact dates or time frames of when the conversation took place. Obviously, the trial court placed a great deal or a significant amount of weight behind its credibility determination. Yours specifically says more importantly in that section the finding had a substantial prejudicial impact on the outcome of the case. And without being fully apprised and acknowledging that in hindsight, yes, there were other methods available, the trial court was unable to make the fully informed decision without knowing or hearing or seeing or having the opportunity to know exactly what the answer to the interrogatory was. There was a conversation. The substance of the conversation was disclosed. The supplemental record on appeal does show that. And we believe it's an abuse of the trial court's discretion to not be fully informed on the answer prior to ruling. Again, that was the procedure that was used on others, on other witnesses during the same trial. The judges, if you all have no more questions, Justice Evaldo, I'll yield the rest of my time. Thank you, counsel. You'll have an opportunity for rebuttal. I want to mention at the outset to mention that Justice Goldenhurst isn't able to be here today, and he'll listen to the oral argument online as they are recorded. Mr. Heiligenstein, you now may proceed. Thank you, Judge. May I please report, fellow counsel? I'm going to talk today about some Supreme Court cases that both briefs have mentioned, the Nationwide case as well as the Monroe v. Shrake case. And the reason why I want to talk about the Monroe v. Shrake case is I do think it's important. And the appellate in this case is operating under the assumption of the law nationwide dealing with a presumption of advertisee, okay, if certain conditions are met. In this particular case, there's four tracts of land, and there's a field road, and then it winds back through essentially a timber path. And those three tracts of land, then it comes out to the lively field. And the appellate is under the misguided idea that somehow there's this presumption of advertisee. However, there's not. In the Monroe v. Shrake case, the idea behind traveling across unoccupied, open land is that first use is presumed to be permissive. And that's a very critical distinction to make with respect to the Monroe v. Shrake case. The appellate in this case somehow suggests that Monroe v. Shrake doesn't apply because there in that case, the origin of the road was shown. But what they fail to understand is that the reason why the origin of the road was shown was because in that case, the predecessor of the proposed dominant estate, he testified that he purchased the land. Next to the Monroe property, the road was already on the Monroe property. He went ahead, he traveled across the Monroe property, he never asked anybody for any permission. The Supreme Court in that case found that there was a house on that property, there was an apple orchard on that property, there were fences, there was a gate at one point. And the court found there was no evidence that anybody lived on there, that it was occupied. And they found that the first use was presumed to be permissive. And that's the importance of that case. So in 1965, when Paul Hills first started going down these four different tracks of property, there was a clubhouse on one of the four tracks. In 1965, when he starts going down, the first property he gets to is the Millan property. And that's the property right off Broadtown Road. It's interesting to note that up until 1967, he was farming on the Millan property. So I don't know how one can say that that first use was somehow adverse when in fact he was farming the very ground that he was traveling on to get to the Leibig Field. The remaining three tracks essentially were described throughout this lawsuit and for the two days of trial as nothing, there was a road leading up to the clubhouse. Then after that, through the remaining tracks, there was essentially a path that wound through the woods. I would submit that that would be unoccupied open land. And I believe the court did that as well. The court in this case didn't find that there was any of the elements of an easement met in this case through Paul Hills' use of that road. And the nationwide case, it's important to discuss that because in the nationwide case, if you remember, Mrs. Mabler, she was the precedent landowner of a dominant estate. And in that case, she testified that when she purchased the ground, there was never any conversations about permission, how to use the road of the Serbian estate. She went ahead for I think it was 15 years. She went ahead and went across this property. She did maintenance on the property. And then subsequently, she sells it to the successors of interest to the dominant estate. Again, it was never discussed, the issues of permission, the issues of going across the Serbian estate's property. And they go ahead and use it for a period of time. And then there, the nationwide court talks about this origin, this presumption of adversity. Here we have just the opposite. In 2011, Alvin Hills purchased this ground from the individual he was farming it from. It was purchased from the Leibig Trust. And at that time, Mr. Leibig had died in 2004. So from 2004 to 2011, Mrs. Leibig was the trustee. At least we know she was the trustee at the time of the sale in 2011. And in 2011, Alvin Hills, the appellate in this case, in his own direct testimony in his trial, I strike that, his cross-examination, in his direct testimony during cross-examination in his trial, he told Mrs. Leibig there's no written easement to this ground. And that's also where they continue to discuss the permission. You know, Leibig testified in this case that Alvin Hills told her that he had permission to use the access road from the owners of the access road. He furthermore told Mrs. Leibig that it'd be best to sell it to him because other people might not be able to use the property because they're not going to be able to get permission from the tournaments. So, clearly, I can't imagine a more distinguishing set of facts than from just the opposite of the nationwide case where Mrs. Mayworm never asked anybody, they never discussed anything about permission in any of the sales. The sales when she bought the property and the sales when she subsequently sold it to the proposed dominant estate. The court, I'm going to talk a little bit about the 1987 when there was testimony from Alvin Hills at that time he took over his father's farming operation. They took over the lease at the Leibig Estate. However, there was also testimony in this case that prior to 1987, he helped his father out there. He testified to that in his direct examination. He said he'd helped his father since about 65. And there's also testimony that after 1987, Paul Hills continued to go out on the road. He continued to help his son farm. And I think that's just important because they're trying to claim that somehow there's negligence on our part for not knowing who was out there. But the fact of the matter is two other witnesses for the appellate in this case testified, Mary Grass and Kathy Grass, and both of them testified. One during direct examination, she said, I never knew Paul Hills not to use those roads. And the second witness from the appellate during cross-examination, when asked whether or not Paul Hills used the property up until 1999, she said, yeah, I think probably so. I don't have it right here in front of me, but it was affirmative that that had occurred. And what I'm getting at is it kind of wraps around the whole idea of a neighborly relationship. The court in this case found that there was a close neighborly relationship between Paul Hills and my client, James Terman. They were lifelong friends. They were friends for over 40 years. And as the courts well know, a neighborly relationship can be inferred. And so if this started out as permissive, and then in 1976 when my client purchased the property, at least the first parcel, arguably you can say that, well, now there's been a change in the situation. However, those two were friends. And so I would submit that this neighborly relationship existed. And for the court to find the use of the road to be permissive based upon that, I think is looking at the evidence in a light most favorable to the plaintiff, clearly the court could have made that finding. So the neighborly relationship extended until his death in 1999. After that, Alvin Hills continued to farm the property. Now, I would submit that this courtesy that he gave to his father was also given to his son by not just my client, James Terman, but by Neil and Wade Terman. Neil Terman testified he was a friend of Alvin's as well. And I would submit that the earliest, I don't think it became, first of all, let me say this, I don't think until 2011 when my client told him not to go down the road, if he went down the road after that, I believe that would begin the 20-year period for adversity. But to back up a second, to give the benefit of the doubt to the appellate here, the earliest that my clients would be aware that Paul Hills was no longer farming this property and that Alvin Hills was farming this property was roughly 1999-2000. If that's the case in 20 years, that hasn't come and gone. So the court, and there's one final other matter that was presented at trial and the court touched on it in its brief as well, is that in early 80s, my client was having some issues where he thought there were some coon hunters down there. He went down to his road, he saw Paul on the road. At that point he told Paul I didn't want him using the road. And they had a conversation about it and Paul asked him what it would take to let him use it. Those two were good friends. Paul worked for the REA and my client said, well, if you help me put a cable gate on the road, you can keep on using it. Now granted, they're not building the Golden Gate Bridge and it's somewhat of a token of, well, it's a situation that occurred between those two men, but there's evidence there that permission was given in 1983. Now if we know that Paul Hills was farming and erecting that ground in 1960s up until 1967. Let me ask you a question, Captain. Are you saying that the record will show that in 1983 that's when the cable was erected? Well, he testified that they placed the cable up and we know that the cable did go up because even Alvin Hills acknowledged that it existed for a period of time. But the conversation with respect to giving permission to use the road occurred and my client testified, of course, this is a long time ago, he believed it was in 82 and 83. That was with Paul? That was with Paul. And that's the father? Right. And Alvin is the son? Alvin's the son. And my client knew Alvin his entire life, essentially, since 1960. They, well, I mean the record's fairly clear that these two families were close families at one point and I submit that these are not strangers. And I'm going to give you one additional example here of how this case and how this law would apply with respect to nationwide. In 1987, Alvin Hills had stopped farming the ground and the libraries had sold the property to Joe Halligenstein. And Joe Halligenstein, from that point, 1987 until 2011 when I sell it to Tim Hudspeth, if I had gone across that road and it wasn't discussed between me and Mrs. Libig about permission, if I had gone across that road, those four different tracks to get to my field and farm, and I did that from 1987 to 2011 when I subsequently sold it to Tim Hudspeth, he continues to go down that road and get to the field, well, then you have a nationwide situation, okay? If those events had occurred, I submit that there would at least be the presumption of it being adverse from 1987 on. We simply don't have that here. It's interesting for them to know Alvin Hills took over the tenant relationship with the Libig field. I want to make a point on something, too, with respect to this impeachment issue before I forget about it. There was more to this impeachment rather than just Alvin Hills, Alvin Hills testified that my client told him two things. My client told him that he knew that he took over the tenant operation from his father. That's one, and two, that my client told him to no longer go down that road. And the court has allowed these interrogatories to come in. If you look at those interrogatories, there's nothing in there about my client telling him that he knew that he had taken over his father's operation. And it's extremely important what happened here. What happened here was Alvin Hills, who had the luxury of looking at the previous court order from the preliminary order, in the previous court order, preliminary order, when you look at the record, it says that there was no reason for the terminant to suspect that Alvin Hills had taken over his father's operation. Okay? So at the trial, he testifies, in 1987, Jim Turman came to me and told me he was aware that I had taken over the lease and told me not to use the road. He's trying to create his 20-year period at that point. That's what happened. And he didn't testify to it at the previous hearing. Okay? And I asked him that in my cross-examination. And it's important because when you look at the interrogatory, not only is that conversation not divulged, but also in the interrogatory, if you look at his answer at the interrogatory, he also says that he'll testify consistently with his preliminary, with his, whatever he testified to in his previous hearing, he could testify to those subject matters as well. So impeachment wasn't complete at that point. There's no reason for me to introduce the interrogatories. And I know you're well aware of this. At that point, it would essentially be overkill. But I mean, it's up to him to introduce the interrogatories and attempt to rehabilitate his witness if he felt at the time that his client could be rehabilitated. So I can't, the trial judge, well, I know you guys are on this, but I don't believe that the trial judge abuses discretion in any way. So in conclusion, in fact, one second, because I haven't looked at my notes. I want to just make sure I'm straight, but. You still have time, Counselor. All right. Thank you. Thank you. I do want to touch on one other issue with respect to this conversation that occurred in 1982 and 83. And I know the courts have read the cases, and I know they've read the Roller case, but even if you forget everything else that's happened here today, and you believe that somehow in 1965 that Paula Hills' use, even though he was a tenant on one of the pieces of property and the other property was vacant, but somehow you believe that his use began as adverse in 65, he was given permission in 82, 83. And the Roller case talks about that. And it will, that act and that acquiescence by the reported dominant estate, at that point, extinguishes any easement which might have existed up to that time. And it will not change again until something adverse happens. And that's the law, that's the easement law in Illinois. And the earliest that I would submit that could be argued that something changed would have been in 2000, the death of Paula Hills when his son took over. And still we have not met the 20-year requirement. So I believe that the decision should be affirmed. And I thank you for your time. And if you don't have any questions, then I'm done. Thank you, Counsel. Mr. Hudson. Thank you, Your Honor. What the defendants have argued is that any permission that Paula Hills may have had to use the property automatically extends to the plaintiffs, to Alvin Hills. I think the court needs to recognize that those are two different individuals. The record does talk about Paula Hills being close friends with the defendants. No less than four of the defendants' witnesses describe Paula Hills as being a good friend, a close friend, a family friend. Taking that as true, that would also lead to the premise that they would know when Paula Hills stopped farming the land and when Alvin Hills took it over. So that would not be in 2000 that they first became aware of some change that Paul's no longer farming and Alvin is. That would be back much closer in 1987 when the evidence shows that Alvin Hills did in fact take over the formal leasing of the property. Whether he was down there before with his father, with Paul, or whether Paul was there after taking Paula Hills as being close family friends with the defendants, they're in position to know when he stopped farming. Any feelings of relationship or neighborly courtesies that extended to Paul. So you're saying, counsel, that the record is clear that in 1987 the Timmermans became aware that Alvin had taken over? No, that's not what the record says. The Timmermans do not say that they were aware in 1987. What I'm saying is given their close relationship and the way they describe their close relationship with Paul Hills, I think it's reasonable to believe that they actually did know at that time. It wasn't upon Paul's death in 1999 or 2000 that they first became aware. No, the record, I don't think, shows that the defendants knew in 1987. I think that's a point of dispute. My position, though, is that they were close friends, they were self-described as close friends, they would have known in 1987. If I could have a moment here, Your Honors. The argument in the record talks about Paul Hills' first using the property, using the roadway in 1965. That's not, the record does not say that that is when the roadway existed. I think that is the key date. If the roadway didn't begin with Paul Hills using it in 1965, the origin of the roadway has never been shown. If he didn't have permission to use the roadway at the time his use began, then I don't think the permissive presumption ever arises. But more importantly, whatever permission Paul had is not automatically transferred to Alvin. When Alvin took over in 1987 is when his time, his 20-year period, began to run. The nationwide case does also talk about neighborly relationships, and I believe it also talks about the presumption of permissive use if the origin of the roadway is not shown. I think the nationwide case very much does, is very analogous to our present case. The origin was not shown in this case, and it was not shown in nationwide. The neighborly relationship was found not to apply in the nationwide case. I don't think it applies here to Alvin Hills. I think we need to separate Paul Hills from Alvin Hills in order to see, in order to distinguish or stop the permissive use and begin Alvin's adverse use. If there are no further questions, that's all. Thank you, counsel. We'll take the case under advisement and render a decision in due course. We'll take a short recess.